UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF FLORIDA

THE UNITED STATES OF AMERICA,

     Plaintiff,

v.                              CASE NO. 22-20162-CR-Scola

CARLOS ALMONTE ALMONTE,

     Defendant.

_____/

### DEFENDANT ALMONTE ALMONTE'S  MOTION FOR DOWNWARD VARIANCE AND MEMORANDUM OF SENTENCING FACTORS PURSUANT TO 18 U.S.C. §3553(a)

NOW COMES the Defendant, CARLOS ALMONTE ALMONTE, by and through his undersigned counsel, and respectfully moves that this Court impose a downward variance from the United States Probation Office's ("USPO") recommended total offense level ("TOL") of 31 to a level of 26, and that he be sentenced to no more than seventy-two (72) months of imprisonment, pursuant to United States Sentencing Guidelines ("USSG") §5B1.1(a)(2).

In support of this request, Mr. Almonte Almonte provides for the Court's consideration a Memorandum of Sentencing Factors incorporated herein, which this Court is authorized to consider in crafting a proper sentence for Mr. Almonte Almonte, pursuant to 18 U.S.C. §3553(a).

### *Guideline Calculations*

On October 6, 2022, Mr. Almonte Almonte pled guilty to Count 1 of a two-count indictment charging him with conspiracy to possess with intent to distribute five kilograms or more of a mixture containing a detectable amount of cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70506(b) (DE #36).

1

The government has agreed to dismiss Count 2, charging him with substantive possession with intent to distribute said cocaine, at the time of sentencing.

In the final Pre-Sentence Investigation report ("PSI"; DE #59), the USPO calculates Mr. Almonte Almonte's guideline range as follows (¶¶22-31):

| | |
|---|---|
| Base Offense Level (BOL)[1]: | 36 |
| Safety valve adjustment | -2 |
| Adjusted offense level | 34 |
| Acceptance of responsibility | -2 |
| | 32 |
| Timely plea of guilty | -1 |
| **Total offense level (TOL)** | **31** |

With a TOL of 31, and with a criminal history category of 1 (¶34), the USPO recommends a sentencing range of 108 to 135 months (¶68).

Mr. Almonte Almonte now asks this Court to find that a downward variance to a TOL of 26, and a sentence of no more than 72 months, will be sufficient, but no greater than necessary, to fulfill the sentencing purposes of 18 U.S.C. §3553(a) and its statutory and legal progeny, and will also be consistent with prior sentences in similarly situated cases in this District.

### _Nature and Circumstances of Offenses_

This discussion shall be brief. No one, least of all Mr. Almonte Almonte, disputes the myriad dangers posed to the interests of the United States and other nations by the international trafficking of illegal narcotics on the high seas. Mr. Almonte Almonte fully recognizes and acknowledges the seriousness of his role in the offense, and the need for imposition of substantial penalties as a deterrent to others. (His prolonged absence from his community in Puerto Plata will presumably underscore that point.)

---

[1]Based on an agreed quantity of 286 kilograms of cocaine (over 150 kg but less than 400 kg), per the Plea Agreement (DE #34).

That said, we now come to the questions that truly lie at the heart of the Court's §3553(a)(1) inquiry.

### *History and Character of Defendant*

*Who is Carlos Almonte Almonte? And how did he arrive at this unfortunate place?*

The PSI, to no small degree, paints an unflattering portrait of Carlos as a classic moral reprobate, dissipating his family's scarce economic resources on drugs, gambling, and illicit sex at every opportunity. Unfortunately, as is more often the case, it provides little to no historical context against which to assess his true moral culpability for these dysfunctions. In journalistic terms, the PSI fails to fully address the **who, where, when, what**, and **how** of Carlos's addictions. And it says nothing whatsoever about the **why**.

It is the last question that we take up here. When viewed in proper context, those addictions, unhealthy as they were, should be understood as self-prescribed psychic salves, liberally applied without professional supervision, to soothe a lifetime of profound, long-buried mental and emotional pain.

We begin with Carlos becoming a shoeshine boy at age 8, not to secure spending change for himself, but because his family's economic struggles forced him to become a secondary breadwinner. His brothers taught him the trade, particularly Martin (the one now incarcerated in the U.S.). He did not maintain a fixed stand, but carried his supplies in a box as he walked local streets, *el Malecon* (the town's waterfront promenade), and other areas where occasional tourists might venture. He charged 10 pesos per shine.[2] Whatever he earned on a given day, he turned over to his parents.

Unfortunately, despite his contributions, the family's financial struggles remained acute, to be exacerbated by his parents' eventual separation. Throughout his school years,

---

[2]At current exchange rates, 10 Dominican pesos equals 28 cents in U.S. currency.

he frequently came to class in ragged, filthy clothing. He remembers numerous occasions when he showed up barefoot because his shoes had become unwearable. And because the schools in Puerto Plata did not provide free lunch to underprivileged children, as is standard practice in the U.S., he often went hungry during the school day.

All these outward indicia of poverty made Carlos the target of frequent bullying by schoolmates; and he had no teacher, counselor, or other adult in authority to intervene on his behalf. Nor did he feel comfortable enough to disclose the abuse to his parents, which in itself speaks volumes. (Of course, being embroiled in their own marital dramas, they would not likely have been receptive in any event.) Needless to say, this unaddressed trauma not only did irreparable damage to his academic performance, to say nothing of his sense of self-esteem, but it predictably fueled his eventual decision to drop out at age 15 to work full-time.

In the course of his secondary bread-winning role, at age 9, Carlos experienced an act of unthinkable repugnance. It happened one afternoon at the hands of a 30-something adult male, a stranger, who saw Carlos walking near the man's apartment building, box in hand, and asked him to make a house call. Not suspecting anything, of course, Carlos agreed. He recalls having worked on the man's shoes for about half an hour when, suddenly, the man unzipped his pants, exposed his erection, grabbed him by the back of his head, and forced him to perform fellatio for what he estimates to have been half an hour. Fortunately, he was not on the receiving end of the man's ejaculation; no firearms or other weapons were employed; and Carlos suffered no physical injury.

Once he was able to extricate himself, however, the emotional injury immediately set in. He withdrew to a secluded location nearby and cried for some period of time, then picked up his shoeshine box and returned to work, trying to shake off the experience as

4

best he could. Consistent with his non-disclosure of the school bullying, he never reported the incident to the police, his parents, or anyone else. His partner, Verenise, knows nothing of the incident. In fact, the first time in almost 40 years that he ever spoke about the incident was during his PSI interview, in response to a direct question by Ofc. Lyons. Otherwise, he might have successfully taken the secret to his grave, as he always intended to do.

This *trilogy of trauma* (poverty, bullying, and sexual violation) would be debilitating enough for a youngster blessed with an effective adult support system, and access to the resources needed for recovery. Unfortunately, as we have seen, young Carlos had no such resources at his disposal; and the stigma of having been sexually abused, even involuntarily, must have been overwhelming. If a similarly situated 9-year-old in the U.S. would be hesitant to make such a painful disclosure, despite our relative availability of healing resources, how isolated must young Carlos have felt during this time?[3]

These, then, were the open psychic wounds for which Carlos instinctively began seeking relief, at age 15. If (as is universally recognized) it takes a village to raise a child, we next have to ask: what was the nature and effect of the village in which Carlos spent these vulnerable years?

By all accounts, his neighborhood in Puerto Plata would not have been conducive to his formative development under ideal family circumstances, much less the ones that he found himself mired in. Poverty and crime were pervasive. The community lacked much in the way of viable infrastructure. Street corner gambling was a common sport, one which he

---

[3]It bears noting that the Dominican Republic, at least at that time, was not generally known as a progressive culture where matters of human sexuality are concerned. For all he knew, Carlos might have found himself being blamed for somehow inviting the abuse, the implications of which would have been too much for a 9-year-old to contemplate.

eventually took up himself. Alcohol and substance abuse were commonplace and overt, while the usual stabilizing influences in a community (schools, churches, charitable institutions, etc.) were either inadequate or non-existent, as were reputable resources for personal recovery. And aside from fishing and tourism, the area provided few opportunities for economic advancement.

As a result, Carlos grew up seeing poor adults self-medicating in various forms, as a means to heal their own emotional turmoil. Given the timing and intensity of his trilogy of trauma, it is no wonder that he eventually followed suit.

Carlos's history of substance abuse became most pronounced between ages 20 and 30. He was eventually kicked out of his family's home for stealing. From 20 to 26, he lived on the streets of Puerto Plata, crashing under bridges and in abandoned buildings, cars, and residential outhouses (still frequent in this area).

Carlos entered the so-called Hogar Crea program at 22 or 23, at his family's insistence. He refers to it as a "so-called" program because it lacked any kind of services of structure. The staff consisted of one director and a couple of supervisors whose primary duty was to oversee the participants as they sold cheap knick-knacks on the street (one of Hogar Crea's primary sources of income). There were no counselors, no individual or group therapy, no 12-Step meetings, or any other indicia of a legitimate drug treatment center. There was no curfew, few if any rules, and no monitoring of anyone's sobriety. Given the total uselessness of the "program," and the acuteness of his addictions, it is noteworthy that Carlos nevertheless gave it his best effort for four months.

Carlos began working as a contracted fisherman (¶59) around age 26.[4] He was approached by an older fisherman named "Osvaldo," who knew of Carlos's plight and urged him to sign up for a voyage in order to begin getting away from the drugs and pulling his life in order.

To secure work, fishermen like Carlos were required to go to the local docks and approach individual captains. Each crew member received a separate contract, one per voyage; normally as many as 50 crew members would work a single voyage, which predictably diminished each crew member's share of the sale proceeds from the catch. Generally speaking, Carlos would contract for four to five voyages per year, when available.

Unfortunately, Osvaldo also introduced Carlos to gambling. They would generally frequent a local casino after a voyage, where D gravitated towards slots and poker; he also shot dice on the street. Of course, he often gambled while under the influence of alcohol or cocaine, which made him unmindful of the amounts he was throwing away. To support his habits (which now also included his dalliances with prostitutes), in addition to his fisherman's wages, he borrowed from a local "street lender," with whom he had a line of credit of sorts, on which he would make payments at the end of each voyage.

It goes without saying that his dysfunctions and their aftermath took a toll on his relationship with his current life partner, Verenise Gomez Felix, and their children. However, despite the turmoil, she has faithfully stood by him, helping to support the family as a cleaning person at a Puerto Plata medical clinic. He credits her for helping him discontinue his use of crack, even though he still struggled with alcohol and powder cocaine. They have maintained regular contact throughout his incarceration, and he has

---

[4]Before becoming a fisherman, Carlos worked as a helper at La Sangorje bakery in Puerto Plata. He also secured occasional jobs as a construction laborer during those years; however, this work was not consistent.

consistently sent home his BOP wages as a janitor in his unit at FDC-Miami, approximately $150 per month.

This, in itself, is certainly a strong indication that Carlos is determined, upon his release and repatriation, to rebuild his family ties and to take on whatever task is required to restore himself as a productive, law-abiding citizen. Also, now that he has been drug-free since his apprehension last April, he is anxious to build upon his new-found sobriety via any and all available means, but during and after his incarceration. (He and Verenise will be using the coming months and years to investigate available support systems such as Narcotics Anonymous.)

By now the picture for the Court should be crystal clear. For all of the ups and downs of his life, self-inflicted and otherwise, Carlos Almonte Almonte is not at all incorrigible. His crime of conviction arose, not out of malice or greed, but desperation driven by the financial pressures he and his family were experiencing, in large part because of how he responded to his pain.

In this light, his story is not at all atypical of Title 46 defendants nabbed on the high seas. The organizers and leaders of these expeditions prey on the under-educated and financially unstable, taking advantage of that very sense of desperation.

On the surface, much of Carlos's pre-arrest conduct can be described as unsavory. But we now understand that his various vices all served as a form of unsupervised self-medication, a readily-available escape from the mental and emotional damage occasioned by his trilogy of trauma, and also a bulkhead against that trauma erupting into, and impairing, his day-to-day functioning as a husband and father.

### *Comparable cases [18 U.S.C. §3553(a)(6)]*

This Court certainly needs no point-by-point, boilerplate exposition on the applicability of *United States v. Booker* and the sentencing factors of 18 U.S.C. §3553(a), or how they apply to Mr. Almonte Almonte's situation. So none will be forthcoming here.

One factor in particular, however, merits further discussion: §3553(a)(6), which— as the Court, of course, is well aware—speaks to "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" In this regard, the downward variance Mr. Almonte Almonte seeks is not an outlier, but is actually consistent with similar variances granted in other cases within this district, two of which have come to the attention of counsel during the pendency of this proceeding.

In *United States v. Epieyu, Escobosa Diaz, and Melo* (22-CR-20014-Gayles), the three co-defendants pled guilty to conspiracy charges similar to those in the instant case. In their factual proffers, each defendant acknowledged responsibility for 1,486 kilograms of cocaine, which placed each defendant at a BOL of 38. With three-point reductions for acceptance of responsibility and timely plea of guilty, and without any other enhancements, each defendant stood at a TOL of 35. With a criminal history category of I, the recommended guideline range would be 168-210 months. Nonetheless, this Court imposed downward variances as to all three defendants, sentencing them to 72 months each.

An almost identical situation presented itself in *United States v. Castro Riascos, Renteria & Mosquera* (20-20194-CR-Scola). Here, the three defendants each acknowledged responsibility for approximately 1,400 kilograms of cocaine, thus facing guidelines calculations similar to those in *Epieyu*. The Court granted downward variances to 72 months as to each defendant.

9

## *Conclusion*

In light of these precedents, and for all the other reasons set forth above, the sentence Mr. Almonte Almonte now requests, while requiring a substantial downward variance, will not result in the kind of unwarranted sentencing disparity that §3553(a)(6) condemns. And as stated before, a sentence of 72 months will be more than sufficient to fulfill the remaining §3553(a) factors.

For all the reasons set forth above, Mr. Almonte Almonte respectfully requests that this Motion be GRANTED, and that this Court impose a sentence of no more than 72 months of imprisonment, pursuant to USSG §5B1.1(a)(2).

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on the 3rd day of February, 2022, on all parties to this litigation, by filing same with the Clerk of Court using CM/ECF.

Respectfully submitted,

*S: // Reginald (Tony) Moss, Jr. //*
**Reginald (Tony) Moss, Jr.**
THE TONY MOSS FIRM, L.L.C.
Florida Bar No. 646318
8101 Biscayne Boulevard #PH-701
Miami, Florida 33138-4634
786.219.5467 (office)
305.373.3832 (fax)
E-mail: *tony@tonymosslaw.com*
Attorney for CARLOS ALMONTE ALMONTE